UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* PATRICIA BEEGLE,<br><br>Plaintiff<br><br>vs.<br><br>SOUTHERNCARE, INC.<br><br>Defendant. | **FILED UNDER SEAL PURSUANT TO**<br>**31 U.S.C. § 3730 AND**<br>**LOCAL CIVIL RULE 5.1.5(a)(1)**<br><br>CIVIL ACTION NO. 13 6633<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED<br><br>**DO NOT PLACE IN PRESS BOX** |

FILED NOV 14 2013 MICHAEL E. KUNZ, Clerk By___ Dep. Clerk

On behalf of the United States of America pursuant to the United States False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA"), Plaintiff-Relator Patricia Beegle ("Relator") files this *qui tam* Complaint for treble damages and civil money penalties against defendant SouthernCare, Inc. (or "SouthernCare"). These claims arise out of the defendant's knowing submission of false and fraudulent claims for payment to the United States Government as set forth below. In support of these claims, Relator alleges as follows:

## I. INTRODUCTION

1. This matter arises from violations of the FCA by SouthernCare, Inc. arising from its knowing submission of false and fraudulent claims for payment to the Medicare program for hospice care provided to individuals who were not terminally ill, in violation of federal rules and regulations.

## II. THE PARTIES

### A. Plaintiff-Relator

2. Plaintiff-Relator Patricia Beegle is an individual citizen of the Commonwealth of Pennsylvania.

3. Relator was employed by defendant SouthernCare, Inc. from July 6, 2007 until July 11, 2013 at its office in Altoona, Pennsylvania.

4. From July 6, 2007 until about March 19, 2010, Relator held the position of Volunteer Coordinator. As a Volunteer Coordinator, Relator's duties included recruiting volunteers to work at SouthernCare's office in Altoona, Pennsylvania and administering volunteer orientation programs.

5. From about March 19, 2010 until January 2013, Relator held the position of Community Relations Specialist (or "CRS"). As a CRS, Relator maintained approximately seventy-five (75) accounts consisting of personal care homes, assisted living facilities, long term care facilities, doctors' offices, hospitals, nursing homes and home health agencies. Relator was required to visit approximately eight (8) to twelve (12) accounts per day to identify potential hospice candidates.

6. From approximately November 2011 until January 2013, Relator also held the position of Community Relations Director (or "CRD"). As a CRD, Relator's duties included managing payroll, supervising two Admissions Coordinators (or "ACs"), one Volunteer Coordinator and three CRSs. As a CRD, Relator also remained responsible for approximately sixty (60) accounts.

7. From January 2013 until July 11, 2013, Relator held the position of Community Relations Manager ("CRM"). As CRM, Relator no longer performed supervisory functions, though she remained responsible for her accounts.

**B. Defendant**

8. Defendant SouthernCare, Inc. ("SouthernCare") is a corporation organized under the laws of the State of Delaware with its corporate headquarters located at 1000 Urban Center Drive, Suite 115, Birmingham, Alabama 35242.

9. SouthernCare has offices in Pennsylvania at the following locations:

   a. 206-A Falon Lane, Altoona, Pennsylvania 16602 (hereinafter referred to as the "Altoona Office");

   b. 1245 Park Avenue, Meadville, Pennsylvania 16335 (hereinafter referred to as the "Meadville Office");

   c. 2656 Wilmington Road, New Castle, Pennsylvania 16105 (hereinafter referred to as the "New Castle Office");

   d. 851 Commerce Blvd., Ste 101, Dickson City, Pennsylvania 18519 (hereinafter referred to as the "Scranton Office");

   e. 90 West Chestnut Street, Suite 500, Washington, Pennsylvania 15301 (hereinafter referred to as the "Washington Office"); and,

   f. 1544 E. Third Street, Williamsport, Pennsylvania 17701 (hereinafter referred to as the "Williamsport Office").

**III. JURISDICTION AND VENUE**

10. The Court has subject matter jurisdiction over this case pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §§ 1331 and 1345.

11. On information and/or belief, venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a) and/or 28 U.S.C. § 1391(b).

12. This Court has personal jurisdiction over the defendant under 31 U.S.C. § 3732(a) because defendant is located in Pennsylvania and because defendant submitted false or fraudulent claims directly or indirectly to the federal government in Pennsylvania.

13. Relator has direct and independent knowledge on which the allegations are based, is an original source of this information to the United States, and has voluntarily provided the information to the United States before filing this action based on the information.

14. This suit is not based on prior public disclosures of allegations or transactions in a criminal, civil or administrative hearing, lawsuit, investigation, audit or report, or from the news media. To the extent that there has been any public disclosure unknown to Relator, she is an original source under 31 U.S.C. § 3730(e)(4).

## IV. STATUTORY AND REGULATORY BACKGROUND

### A. Medicare

#### 1. Statutory and regulatory background

15. Medicare is a federal health insurance system for people 65 and older and for people under 65 with certain disabilities. Medicare Part A provides, *inter alia*, coverage of and payment for hospice care. *See* 42 C.F.R. §§ 418.1-418.2. Hospice care encompasses a "comprehensive set of services...identified and coordinated by an interdisciplinary group to provide for the physical, psychosocial, spiritual, and emotional needs of a terminally ill patient and/or family members, as delineated in a specific patient plan of care." *Id.* § 418.3.

16. The majority of Medicare Part A's costs are paid by United States citizens through their payroll taxes. The benefits covered by Part A of the Medicare Program include hospice care under 42 U.S.C. §1395x(dd).

17. Payments are typically made directly to health care providers, such as SouthernCare, instead of to the patient. This occurs when the Medicare recipient assigns his or her right to payment to the provider, such as SouthernCare. The provider either submits its bill directly to Medicare for payment or contracts with an independent billing company to submit a bill to Medicare on the provider's behalf.

18. In order to bill the Medicare Program, a hospice provider must submit an electronic claim form or a hard-copy claim form called a CMS-1450 form.

19. On the CMS-1450 form, the hospice provider must state, among other things, the identity of the patient, its provider number, the patient's principal diagnosis, the date of the patient's certification or re-certification as being terminally ill, the location where hospice services were provided, and the level of hospice care provided.

20. Hospices are paid a per diem rate based on the number of days and level of care provided to the patient. The four levels of hospice care under Medicare regulations are Routine Home Care, Continuous Home Care, Inpatient Respite Care, and General Inpatient Care. The payments rates are based on which level of care the hospice provider furnished the patient that day. 42 C.F.R. § 418.302; Medicare Benefit Policy Manual, Chapter 9, § 40.

21. All healthcare providers, including SouthernCare, must comply with applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare Part A. A provider has a duty to have knowledge of the statutes, regulations, and guidelines regarding coverage for the Medicare services, including, but not limited to, the following: that in the case of hospice care, Medicare only reimburses services that are reasonable and necessary for the palliation or management of terminal illness. *See* 42 U.S.C. § 1395y(a)(1)(C).

22. Medicare regulations exclude from payment hospice services that are not reasonable and necessary for the palliation or management of terminal illness. *See* 42 C.F.R. § 411.15(k).

### 2. Applicable statutes and regulations

23. To be covered by Medicare, hospice services must "be reasonable and necessary for palliation and management of the terminal illness as well as related conditions." 42 C.F.R. § 418.200. As an initial matter, the beneficiary must elect hospice care. *Id.* After election of hospice, the beneficiary's plan of care "must be established and periodically reviewed" by the attending physician, the medical director, and the interdisciplinary group of the hospice program. *Id.* The plan of care must be established before hospice care is provided, and the services provided must be consistent with the plan of care. *Id.*

24. An individual may elect to receive hospice care during an initial 90-day period; a subsequent 90-day period; or an unlimited number of subsequent 60-day periods. *Id.* § 418.21.

25. In order to be eligible to elect hospice care under Medicare, an individual must be both entitled to Part A of Medicare and certified as being terminally ill in accordance with 42 C.F.R. § 418.22. *Id.* § 418.20.

26. A hospice provider must obtain written certification of terminal illness for the 90- and 60-day periods mentioned above. *Id.* § 418.22(a)(1). The certification for the initial 90-day period must be obtained from the medical director of the hospice or a physician member of the "hospice interdisciplinary group" *and* the beneficiary's attending physician. *Id.* § 418.22(c)(1). For subsequent periods, the certification need only be obtained from the medical director of the hospice or a physician member of the hospice interdisciplinary group. *Id.* § 418.22(c)(2).

27. The certification must specify that the individual's prognosis is "for a life expectancy of 6 months or less if the terminal illness runs its normal course." *Id.* § 418.22(b)(1). The certifying physician must also include a "brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less" as part of the certification (or recertification, if applicable). *Id.* § 418.22(b)(3). The certification must also be accompanied by "[c]linical information and other documentation that support the medical prognosis;" this documentation also must be filed in the beneficiary's medical record. *Id.* § 418.22(b)(2).

### B. The United States False Claims Act

28. The United States False Claims Act prohibits, *inter alia*, the following:

> knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval;
>
> knowingly making or using (or causing to be made or used) a false record or statement material to a false or fraudulent claim; and
>
> knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money to the Government.

31 U.S.C. §§ 3729(a)(1)-(2), and (7) (2006), amended by, 31 U.S.C. §§ 3729(a)(1)(A)-(B), and (G) (West 2010).

## V. DEFENDANT'S CONDUCT IN VIOLATION OF THE FCA

29. As set forth in detail below, SouthernCare has submitted claims to Medicare for hospice care provided to individuals who were not terminally ill, in violation of the federal regulations and statutes outlined above.

### A. False and fraudulent submissions for reimbursement

#### 1. SouthernCare created an environment that encouraged enrollment of Medicare beneficiaries unqualified to receive the hospice benefit

30. As stated above, Relator worked in Community Relations for SouthernCare in the Altoona Office from about July 6, 2007 until July 11, 2013.

31. During this six year period, SouthernCare's Regional Community Relations Directors required Community Relations Specialists (or "CRSs") to each obtain five (5) Medicare beneficiary admissions per month.

32. During this six year period, SouthernCare's Regional Community Relations Directors required "Eastern Region 2" (or "ER2"), which consisted of the Altoona Office, Washington Office, Williamsport Office, and New Castle Office, as well as an office in Austintown, Ohio (hereinafter referred to as the "Youngstown Office"), to obtain sixteen (16) new Medicare beneficiary admissions each month.

33. At all relevant times, on Tuesdays the Regional Community Relations Director held a weekly conference call for the Community Relations Directors (or "CRDs") and Clinical Directors in ER 2.

34. During these calls, Regional Community Relations Director Denise Parris consistently asked the ER 2 CRDs questions to the effect of "What are you doing to get your 16?"

35. At all relevant times, at the beginning of every month (usually the first week of the month), SouthernCare held a national conference call run by Jeff Lang, Senior Vice President of Operations.

36. During the national conference call, Lang reviewed the prior month's non-duplicated Medicare admissions with each office, asking questions to the effect of "I see that you only had X number of admissions; what are we going to do to make that up?"

37. If a particular office had not obtained 16 admissions by the last week of the month, Regional Community Relations Director Parris held a conference call with the CRD and

CRSs of the deficient office, asking questions to the effect of "What are you going to commit to?" and "What are you going to do this weekend?"

38. As a Community Relations Director and as a Community Relations Specialist, Relator constantly received emails from Parris stating words to the effect of "Admit, admit, admit."

39. Parris also sent emails at month's end stating words to the effect of "Anything less than 16 admissions is unacceptable." As Community Relations Director, Relator consistently received emails from Parris directing her to push the CRSs harder to find referrals.

40. The last week of the month at the Altoona Office was particularly stressful for CRSs; each day, Relator would receive emails asking about the status of referrals and admissions. During this week, Parris encouraged CRSs to reach out to their "honey pots" or "honey holes," meaning the most reliable source of hospice referrals.

41. In addition to constant demands to meet the goal of 16 admissions per month, CRSs also received incentives from SouthernCare management.

42. During the last week of June 2013, SouthernCare Administrator Gina Campbell verbally offered the Community Relations Specialists two free Paid Time Off (or "PTO") days for each referral admitted to hospice services by month's end.

43. In early July 2013, Regional Director Parris sent an email offering the Community Relations Specialists two free PTO hours for each referral admitted to hospice services during the month of July, as well as a $50.00 gift card to the CRS with the most admissions that month.

### 2. Specific examples of Medicare beneficiaries unqualified to receive the hospice benefit

44. As a direct result of the consistent pressure to obtain admissions and related incentives provided to admit beneficiaries, many of the beneficiaries admitted to hospice care by SouthernCare were not qualified for hospice care under Medicare regulations.

45. Consequently, a substantial percentage of the beneficiaries enrolled by SouthernCare's Altoona Office were not terminally ill, as defined above.

46. By way of example, the following Medicare beneficiaries were admitted for hospice services when they were not terminally ill:

    a.    **Patient 1** (admitted 8/4/08; discharged 3/31/09; now deceased) was admitted as part of a husband and wife "twofer." A twofer consists of admitting two household members, typically spouses, at the same time. Sometimes, but not always, one of the members of the twofer is terminally ill. After approximately seven (7) months on hospice, Patient 1 was discharged for "failure to decline". During her time on hospice, Patient 1's health was sufficiently good that she drove herself to physician appointments.

    b.    **Patient 2** (admitted 7/27/12; discharged 12/18/12; readmitted in or about 6/2013; alive at the time of this filing) was admitted because SouthernCare had a verbal arrangement wherein SouthernCare would send a certified nursing assistant (or "CNA") to any facility that housed at least six (6) SouthernCare hospice recipients. The CNA worked twenty-four (24) hours per week at any such facility. At all relevant times, Patient 2 resided at Facility No. 1. After approximately five (5) months on hospice, Patient 2 was discharged for "failure to decline". During her time on hospice, Patient 2's health was sufficiently good that she helped Facility No. 1 staff assist other patients.

    c.    **Patient 3** (admitted 5/31/12; discharged 11/26/12; alive at the time of this filing) was admitted so that she would stop bothering the staff at Physician No. 1's office. In other words, she was requesting services of the office staff that she could obtain from hospice. After approximately six (6) months on hospice, Patient 3 was discharged for "failure to decline". During her time on hospice, Patient 3 performed her activities of daily living (or "ADLs") (*e.g.*, cooking, bathing) without assistance.

d. **Patient 4** (admitted 12/14/11; discharged 2/18/12; alive at the time of this filing) was admitted as part of a husband and wife twofer. Patient 4's husband was terminally ill; however Patient 4 was placed on hospice with a diagnosis of "debility, unspecified." After approximately two (2) months on hospice, Patient 4 was discharged for "failure to decline". During her time on hospice, Patient 4 was able to independently perform her ADLs.

e. **Patient 5** (admitted 4/10/12; discharged 8/3/12; readmitted; alive at the time of this filing) was admitted after her daughter sought physician advice regarding Patient 5 being lonely at her independent living residence. After approximately four (4) months on hospice, SouthernCare discharged Patient 5 as follows: "Revoke - Aggressive Treatment." During her time on hospice, Patient 5 independently performed her ADLs.

f. **Patient 6** (admitted 3/22/12; discharged 6/19/12; now deceased) was admitted as part of a twofer; Patient 6 was the girlfriend of beneficiary Patient 21, *infra*. After approximately three (3) months on hospice, Patient 6 was discharged for "failure to decline".

g. **Patient 7** (admitted 6/29/11; discharged 8/10/11; alive at the time of this filing) was admitted as part of an attempted twofer; her husband refused to elect hospice. Patient 7 was admitted at the end of the month, when pressure to meet the goal of 16 admissions was highest. After approximately two (2) months on hospice, SouthernCare discharged Patient 7 as follows: "Revoke - Aggressive Treatment." During her time on hospice, Patient 7 engaged in active outdoor gardening.

h. **Patient 8** (admitted 1/31/12; discharged 7/28/12; alive at the time of this filing) was admitted because it was the end of the month and the Altoona Office needed to meet the monthly goal. After approximately six (6) months on hospice, Patient 8 was discharged for "failure to decline". During his time on hospice, Patient 8 independently performed his ADLs.

i. **Patient 9** (admitted 8/13/12; discharged 11/10/12; alive at the time of this filing) was admitted as part of a twofer; Patient 9's wife was terminally ill. After approximately three (3) months on hospice, Patient 9 was discharged for "failure to decline".

j. **Patient 10** (admitted 10/24/08; discharged 4/21/09; alive at the time of this filing) was admitted so that she would stop bothering the staff at Physician No. 1's office. After approximately six (6) months on hospice, SouthernCare discharged Patient 10 as follows: "Revoke - Aggressive Treatment." During her time on hospice, Patient 10 drove herself to physician appointments and independently performed her ADLs.

k. **Patient 11** (admitted 2/27/12; discharged 3/7/12; alive at the time of this filing) was admitted because it was the end of the month and the Altoona Office needed to meet the monthly goal. After approximately one (1) month on hospice, SouthernCare discharged Patient 11 as follows: "Revoke - Aggressive Treatment." During her time on hospice, Patient 11 independently performed ADLs and drove herself to errands, such as trips to Wal-Mart and at least one beauty appointment.

l. **Patient 12** (admitted 7/21/11; discharged 8/3/11; now deceased) was admitted so that her family would stop bothering the staff at Physician No. 1's office. After approximately two (2) weeks on hospice, SouthernCare discharged Patient 12 as follows: "Revoke – Non-Contracted Facility." During her time on hospice, Patient 12 independently performed her ADLs (*e.g.*, cooking for herself).

m. **Patient 13** (admitted 7/29/11; discharged 10/26/11; alive at the time of this filing), then 50 years of age, was having financial difficulties subsequent to a recent surgery. After approximately four (4) months on hospice, Patient 13 was discharged for "failure to decline". During his time on hospice, Patient 13 drove regularly, rode his motorcycle, and independently performed his ADLs.

n. **Patient 14** (admitted 9/15/11; discharged 11/26/11; alive at the time of this filing) was admitted as a result of the arrangement with Facility No. 1 described above (*see* Patient 2). After approximately two (2) months on hospice, SouthernCare discharged Patient 14 as follows: "Revoke - No Longer Desires Hospice." During her time on hospice, Patient 14 performed her ADLs unassisted (*e.g.*, bathing, dressing, grooming, and feeding). On information and belief, Patient 14's family withdrew her from hospice because they believed she was not appropriate for the benefit.

o. **Patient 15** (admitted 2/10/12; discharged 2/4/13; alive at the time of this filing) was admitted as a result of the arrangement with Facility No. 1 described above (*see* Patient 2). After approximately one (1) year on hospice, SouthernCare discharged Patient 15 as follows: "Revoke - Aggressive Treatment."

p. **Patient 16** (admitted 3/21/12; discharged 9/16/12; alive at the time of this filing) was admitted because her family did not want her placed in a home; the staff at Physician No. 1's office asked if Relator could help. Patient 16's Admissions Coordinator said words to the effect of "She's not appropriate; I'll see what I can do;" nevertheless, she was admitted to hospice thereafter. After approximately six (6) months on hospice, Patient 16 was discharged for "failure to decline". During her time on hospice, Patient 16 performed her ADLs unassisted (*e.g.*, cooking, housekeeping).

12

q.  **Patient 17** (admitted 7/15/11; discharged 1/10/12; alive at the time of this filing) was admitted as part of a husband and wife twofer, along with her husband, Patient 18, *infra*. After approximately six (6) months on hospice, Patient 17 was discharged for "failure to decline". During her time on hospice, Patient 17 performed ADLs unassisted (*e.g.*, cooking, cleaning).

r.  **Patient 18** (admitted 7/15/11; discharged 1/4/13; alive at the time of this filing) was admitted as part of a husband and wife twofer, along with his wife, Patient 17, *supra*. After approximately one and a half years on hospice, Patient 18 was discharged for "failure to decline". During his time on hospice, Patient 18 regularly drove to the local convenience store to purchase cigarettes and visit his daughter, the store manager.

s.  **Patient 19** (admitted 3/17/12; discharged 10/12/12; alive at the time of this filing) was admitted as part of a mother and daughter twofer, along with her daughter, Patient 20, *infra*. After approximately seven (7) months on hospice, Patient 19 was discharged for "failure to decline".

t.  **Patient 20** (admitted 1/13/12; discharged 10/12/12; alive at the time of this filing) was admitted as part of a mother and daughter twofer, along with her mother, Patient 19, *supra*. After approximately nine (9) months on hospice, Patient 20 was discharged for "failure to decline".

u.  **Patient 21** (admitted 8/31/10; discharged 2/15/13; alive at the time of this filing) was admitted because it was the end of the month and the Altoona Office needed to meet SouthernCare's monthly goal. After approximately two (2) years, six (6) months on hospice, Patient 21 was discharged for "failure to decline". During his time on hospice, Patient 21 performed his ADLs unassisted.

v.  **Patient 22** (admitted 2/2/12; discharged 9/28/12; alive at the time of this filing) was admitted so that she would stop bothering the staff at Physician No. 1's office. After approximately seven (7) months on hospice, Patient 22 was discharged for "failure to decline". During her time on hospice, Patient 22 regularly attended Sunday church services.

w.  **Patient 23** (admitted 10/26/11; discharged 12/18/12; alive at the time of this filing) was admitted as a result of the arrangement with Facility No. 1 described above (*see* Patient 2). After approximately one (1) year, two (2) months on hospice, Patient 23 was discharged for "failure to decline".

x.  **Patient 24** (admitted in 2013; alive at the time of this filing) was admitted to Hospice so that her son would stop bothering the staff at Physician No.

13

>   1's office. Patient 24 had a prior history of throat cancer; however, her cancer was in remission at the time she was referred to hospice. Patient 24 was in such good health that she often cooked meals for visiting SouthernCare hospice case managers. After approximately three (3) months on hospice, Patient 24 was discharged for failure to decline.

47. Based on Relator's personal knowledge of their medical condition, all twenty-four of the aforementioned beneficiaries were not terminally ill and this was known to SouthernCare at the time of their admission to hospice.

48. SouthernCare acted in reckless disregard to the fact that these beneficiaries, among others, were not terminally ill.

49. SouthernCare was aware that these beneficiaries, among others, were not terminally ill and thus not appropriate for the hospice benefit.

50. Nevertheless, SouthernCare admitted these beneficiaries, and others, who were not qualified for hospice care under the abovementioned Medicare regulations.

**B.     False Claims and the Government's Damages**

51. At all relevant times, SouthernCare has had numerous patients who are beneficiaries of the Medicare program described above.

52. At all relevant times, SouthernCare sought and received payment from Medicare for patients receiving hospice services at its Altoona Office.

53. At all relevant times SouthernCare sought and received payment from Medicare for patients receiving hospice services at its Meadville, New Castle, Scranton, Washington, Williamsport, and Youngstown offices.

54. SouthernCare knowingly and willfully billed Medicare, and further knowingly and willfully failed to reimburse Medicare, for hospice services that did not meet Medicare's requirements.

55. At all relevant times, SouthernCare knowingly concealed and continues to conceal its obligation to pay or transmit money to the United States.

56. The United States, through its carriers and intermediaries, has made payments to SouthernCare and has been damaged in an amount to be determined. The United States is entitled to treble its actual damages and to civil penalties in the amount of $5,500 to $11,000 for each of the false claims submitted.

## COUNT I

### (VIOLATION OF THE FALSE CLAIMS ACT – 31 U.S.C. § 3729(a)(1)(A) (West 2010), formerly 31 U.S.C. § 3729(a)(1) (2006))

57. Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

58. Defendant knowingly presented, or caused to be presented, and continues to present or cause to be presented, false and fraudulent claims for payment or approval to the United States – *i.e.*, the foregoing false and fraudulent claims for payments from Medicare – in violation of 31 U.S.C. § 3729(a)(1) (2006), amended by 31 U.S.C. § 3729(a)(1)(A) (West 2010).

59. Said false and fraudulent claims were presented with defendant's actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

60. The United States relied on these false and fraudulent claims, was ignorant of the truth regarding these claims, and would not have paid defendant for these false and fraudulent claims had it known the falsity of said claims by defendant.

61. As a direct and proximate result of the false and fraudulent claims made by defendant, the United States has suffered damages and therefore is entitled to recovery as

provided by the False Claims Act in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such violation of the False Claims Act.

## COUNT II

**(VIOLATION OF THE FALSE CLAIMS ACT – 31 U.S.C. § 3729(a)(1)(B) (West 2010), formerly 31 U.S.C. § 3729(a)(2) (2006))**

62. Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

63. Defendant knowingly made, used or caused to be made or used, and continues to make, use and cause to be made or used, false records or false statements material to the foregoing false or fraudulent claims to get these false or fraudulent claims paid and approved by the United States, in violation of 31 U.S.C. § 3729(a)(2) (2006), amended by 31 U.S.C. § 3729(a)(1)(B) (West 2010).

64. Defendant's knowingly false records or false statements were material, and upon information and belief continue to be material, to the false and fraudulent claims for payments it made and continues to make to the United States.

65. Defendant's materially false records or false statements are set forth above and include, but are not limited to false Medicare claim forms and supporting materials, such as internal billing forms, and false certifications of the truthfulness and accuracy of claims submitted, to get false or fraudulent Medicare claims paid or approved by the United States, in that the hospice services claimed were for patients who were not eligible for Medicare hospice benefits during all or part of the time.

66. These said false records or false statements were made, used or caused to be made or used, and continue to be made, used and caused to be made and used, with defendant's actual

knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

67. As a direct and proximate result of these materially false records or false statements, and the related false or fraudulent claims made by defendant, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such violation of the False Claims Act.

### COUNT III

### (VIOLATION OF THE FALSE CLAIMS ACT – 31 U.S.C. § 3729(a)(1)(G) (West 2010), formerly 31 U.S.C. § 3729(a)(7) (2006))

68. Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

69. Upon information and belief, defendant knowingly made, used or caused to be made or used, and continues to knowingly make, use or cause to be made or used, false records or false statements, material to an obligation to pay or transmit money or property to the United States Government, or knowingly concealed and continues to conceal an obligation to pay or transmit money or property to the United States Government, or knowingly and improperly avoided or decreased, and continues to knowingly and improperly avoid and decrease, an obligation to pay or transmit money or property to the United States Government, in violation of 31 U.S.C. § 3729(a)(7) (2006), amended by 31 U.S.C. § 3729(a)(1)(G) (West 2010).

70. As a direct and proximate result of the above conduct by defendant, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation of the False Claims Act.

## CLAIM FOR RELIEF

WHEREFORE, Relator requests that judgment be entered against defendant SouthernCare, Inc. for treble the amount of the United States' damages to be determined at trial, and all allowable civil penalties, fees, interest and costs under the False Claims Act and for all other and further relief as the Court may deem just and equitable.

Dated: Philadelphia, Pennsylvania
       November 14, 2013

Respectfully submitted,

**KLINE & SPECTER**

BY: _____
THOMAS R. KLINE, ESQUIRE
DAVID J. CAPUTO, ESQUIRE
DAVID C. WILLIAMS, ESQUIRE
1525 Locust Street, Nineteenth Floor
Philadelphia, Pennsylvania 19102
(215) 772-1000
Tom.Kline@klinespecter.com
David.Caputo@klinespecter.com
David.Williams@klinespecter.com

*Attorneys for the Plaintiff-Relator*

**JOSEPH TRAUTWEIN & ASSOCIATES, LLC**
BY: JOSEPH TRAUTWEIN, ESQUIRE
17 Auchy Road
Erdenheim, Pennsylvania 19038
(215) 764-2301
jtrautwein@cpmiteam.com

*Attorney for the Plaintiff-Relator*